Glenn F. Ostrager [GFO 2023]
Roberto L. Gomez [RLG 6474]
Andres N. Madrid [ANM 5926]
OSTRAGER CHONG FLAHERTY AND BROITMAN P.C.
570 Lexington Avenue, 17th Floor
New York, New York 10022
(212) 681-0600

**Attorneys for Plaintiffs**

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LIFE IS GOOD, INC., <br><br> Plaintiffs, <br><br> v. <br><br> BENNETT SPANBOCK & CO., INC., RICHARD SPANBOCK, JAREL ENTERPRISES, INC., and JEFF MAST, <br><br> Defendants. |  <br> Civil Action No. 07 CIV 2738 <br><br> (*Jury Trial Demanded*) |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER, EXPEDITED DISCOVERY AND ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION

### PRELIMINARY STATEMENT

Life is good, Inc. ("Life is good") owns the trademarks "Life is Good," the "Jake Symbol," and "Do What You like, Like What You Do," in connection with T-Shirts, clothing, and other products (collectively the "Marks"). Life is good has registered each of the Marks with the United States Patent and Trademark Office. Life is good adopted its Life is good and Jake Symbol marks in 1994, and has used them extensively throughout the U.S. since that time,

garnering gross sales in excess of $250 Million. Through such use, the Marks have acquired substantial goodwill and consumer recognition as a brand of high quality products.

Defendants Richard Spanbock, Bennett Spanbock & Co., Jeff Mast, and Jarel Enterprises (collectively "Defendants") recently commenced marketing and selling counterfeit T-Shirts that are virtually identical to Life is good's products. Defendants' counterfeit use of Plaintiff's Marks is diverting sales from Life is good and misleading the marketplace, thus necessitating the claims for injunctive and other relief herein. In connection with its marketing of counterfeit Life is good products, Defendants are also misleading the public to believe that their products are actually products manufactured by Life is good. It is manifest that Defendants' unauthorized "Life is good" products trade upon and dilute Plaintiff's' long established trademark rights, causing Plaintiff immediate and irreparable injury.[1]

Plaintiff seeks, pursuant to Fed.R.Civ.P. 65(a), to preliminarily and permanently enjoin Defendants from all use of the Marks. Plaintiff further seek expedited discovery with respect to Defendants' promotion, marketing and sales of their counterfeit Life is good products. A preliminary injunction is necessary to immediately stop the blatant counterfeiting that Defendants have committed.

## FACTUAL BACKGROUND

A. <u>The Plaintiff and its "Life is good", "Jake" and "Do What You Like, Like What You Do" Trademarks.</u>

Since at least as early as 1994, and continuously therefrom, Plaintiff and its predecessor have sold various products such as T-Shirts, hats, other clothing, stationery, flying discs, coffee

---

[1] The Complaint asserts causes of action for trademark infringement, trademark counterfeiting, dilution, false representation, and unfair competition arising under the Trademark Act of 1946, as amended (the Lanham Act, 15 U.S.C. §§ 1051 *et seq).*

mugs, *inter alia*, under the trademark "Life is good." The goods have been sold to retail stores and consumers by Life is good or through its web site. Verified Complaint, ¶8 (hereinafter, "Compl., ¶__").

For more than ten years, Plaintiff has continuously and pervasively utilized its "Life is good" trademark throughout the United States and within this district on products, hang tags, displays, boxes, its web site (www.lifeisgood.com), packaging and labels, and in catalogs and other places. Compl., ¶9.  Since 1994, Life is good has generated revenue in excess of $250 million from sales of its products in the United States. Compl., ¶10.

Since 2002, Life is good has owned and operated a retail store in Newburyport, Massachusetts and then in 2003 it opened another retail store in Portland, Maine.  Both stores exclusively sell Life is good products.  Further, in 2005, Life is good opened another such store on Newbury Street, Boston, Massachusetts.  Life is good also distributes its products through thousands of retail stores across the United States and internationally. Compl., ¶11. In short, Plaintiff has invested substantial resources in promoting its products under the "Life is good" mark, and in developing national recognition of its "Life is good" mark.  As a result, the "Life is good" mark is a distinctive indicator of Plaintiff's goods. Compl., ¶12.

On December 24, 1996, the United States Patent and Trademark Office (the "U.S.P.T.O.") issued a registration for plaintiff's trademark "Life is good," registration number 2,025,737 (the "'737 Registration" ). The registration was issued to Jacobs Gallery, which was a d/b/a used by Albert Jacobs and John Jacobs – the founders of Life is good.  The goods under this registration are "Sportswear, namely T-shirts, sweatshirts, shirts, hats, pants, and shorts." The trademark was assigned by Jacobs Gallery to Life is good, Inc. on April 16, 1998. On April 6, 2002, the U.S.P.T.O accepted Life is good's section 8 and 15 affidavit for the '737

registration, and thus, it has become incontestable. Compl., ¶13. Life is good has also registered the "Life is good" trademark for "printed matter, namely posters, greeting cards, stationery, and bumper stickers" (Reg. No. 2,481,887), "recreational products, namely flying plastic discs" and "ceramic mugs" (Reg. No. 2,692,561), for "toys, clothing, bed blankets, towels, backpacks, luggage, and animal leashes and collars" (Reg. No. 2,826,245) and for "pet bowls for eating and drinking" (Reg. No. 2,865,595). Compl., ¶14.

In addition, Plaintiff, through assignment from Jacobs Gallery, has registered the "Jake Symbol," which appears as follows.



The "Jake Symbol" was registered on April 22, 1997, Reg. Number 2,055,452.  The U.S.P.T.O. accepted Life is good's section 8 and 15 affidavit for the "Jake Symbol" registration, and thus, it has become incontestable.  Compl., ¶15.  On May 29, 2001, the U.S.P.T.O. issued a registration for Plaintiff's trademark "Do What You Like, Like What You Do," registration number 2,454,376.  The goods under this registration are "Sportswear, namely T-shirts, sweatshirts, shirts, hats, pants, and shorts."  Compl., ¶16.

The trademark "Life is good" appears on virtually every product sold by Life is good. Moreover, the "Jake Symbol" appears on the vast majority of Life is good's T-Shirts, most often on the top of the back of the shirt. Furthermore, the trademark "Do What You Like, Like What You Do" appears on the bulk of Life is good T-shirts on locker patches, which are tags attached

to the T-Shirts. Compl., ¶17. *See* true copies of the relevant registration certificates for each of these marks attached to the Complaint as "Exhibit A."

Life is good's corporate philosophy is based on the concept that through the sale of fun products, positive energy and contagious optimism may be spread. To further that concept, Life is good sponsors various charitable events such as the "Life is good" Pumpkin Festivals held each year from 2003 to 2006 in Portland, Maine and Boston, and the "Life is good" Watermelon Festival held in Boston each June from 2004 to 2006. At the most recent Pumpkin Festival held on the Boston Common in October 2006, over 100,000 participants attended and set a new world record when they amassed 30,128 carved pumpkins to light up the Common. Life is good's various festivals have generated a great deal of publicity for the company, including national network television coverage. More importantly, Life is good has donated one hundred percent (100%) of the proceeds from the most recent pumpkin festival, almost $700,000, directly to its beneficiary, Camp Sunshine in Casco, Maine. Camp Sunshine is a camp designed to assist the entire family of kids facing life-threatening illnesses. Through its significant sales and marketing in the U.S. and elsewhere, Life is good has developed a reputation for quality products that are fun, and that create positive feelings. Compl., ¶18, 19.

B. <u>The Defendants' Trafficking In Counterfeit "Life is good" Clothing</u>.

In October 2006, Spanbock, on behalf of BS Co., sent a mass e-mail soliciting the sale of counterfeit "Life is good" T-shirts and attaching a photograph of the shirts. To even a casual observer, it is clear from the photograph that the shirts advertised in the e-mail were counterfeit copies of Life is good merchandise. A customer of Life is good received a copy of this mass e-mail and forwarded it to a representative of Life is good. (A true copy of this mass e-mail is attached to the complaint as "Exhibit B.") Compl., ¶21.

On October 27, 2006, Rich Cremin ("Cremin") of Life is good surreptitiously contacted Spanbock by e-mail and telephone under the pretext of being a prospective purchaser of the counterfeit Life is good shirts. During a telephone conversation, Spanbock offered to sell Cremin 954 counterfeit shirts for $5.50 per unit. Compl., ¶22.

On November 6, 2006, an investigator acting on behalf of Life is good, John DiNatale ("DiNatale"), contacted Spanbock by telephone and e-mail under the pretext of being a prospective purchaser of the counterfeit Life is good shirts. During a telephone conversation Spanbock offered to sell 209 shirts to DiNatale. Spanbock refused DiNatale's request to meet personally, stating that "his partner" didn't want anyone at his place of business. During this conversation, Spanbock was only interested in discussing shipping and payment details. Compl., ¶23. Subsequently, on November 7, 2006, Spanbock called DiNatale and stated that he would only accept a bank check or business check and would ship the "Life is good" shirts once the check was received and cleared. Spanbock then sent an e-mail to the investigator instructing him to make the check payable to Jarel Enterprises and send it to Jarel Enterprises at 2 Pine Acres Drive, Medford, New Jersey. (*See* series of e-mails exchanged between DiNatale, Spanbock and Mast, true copies of which are attached to the complaint as "Exhibit C.") Compl., ¶24.

On November 9, 2006, after DiNatale set up the deal, Cremin sent a purchase order under the name "Fleamarket Mania LLC" to Spanbock and Jarel for 209 assorted "Life is good" shirts. Included with the purchase order was a bank check payable to Jarel Enterprises in the amount of $1,283.10. (*See* purchase order and copy of bank check, true copies of which are attached to the complaint as "Exhibit D.") Compl., ¶25.

On November 13, 2006, Spanbock called Mr. DiNatale and confirmed receipt of the purchase order and funds. Spanbock then requested confirmation of the address to which the

counterfeit shirts were to be sent.  Compl., ¶26.  On November 14, 2006, Mast called DiNatale and identified himself as the owner of Jarel and acknowledged receipt of the bank check. During that conversation Mast stated that he was out of stock of men's shirts but that he had 70 dozen ladies "Life is good" shirts in a variety of styles.  DiNatale agreed to take the ladies' shirts.  Mast also told DiNatale that he was getting the counterfeit shirts from Peru.  The bulk of Life is good's T-shirts are manufactured in Peru.  Compl., ¶27, 28.  On November 20, 2006, Cremin received a shipment of counterfeit "Life is good" shirts (the "Counterfeit goods") from Jarel, shipped to Fleamarket Mania LLC at the Fairfield, Connecticut address provided to Spanbock and Jarel.  Compl., ¶29.

It is plain from a cursory inspection that the Counterfeit goods are bogus copies of genuine "Life is good" shirts incorporating counterfeit marks.  The following are the salient features of the Defendants' T-shirts bearing on their status as counterfeit goods:

- Each of the Counterfeit goods uses a counterfeit of one or more of the "Life is good," "Jake Symbol" or "Do What You Like, Like What You Do" marks and even has a counterfeit "®" trademark notice;






- Each of the Counterfeit goods features a locker patch and inside label identical or nearly identical to the locker patch and label found on a genuine Life is good T-shirt;




- A genuine shirt featuring the "Life is good" mark incorporates the mark stitched onto the fabric "in relief" whereas the mark is merely printed on the Counterfeit goods featuring a fake "Life is good" mark;

- Similarly, where a shirt features artwork or a design other than "Life is good" the artwork on a genuine shirt is a textured decal whereas the same design is merely printed onto the corresponding Counterfeit goods;

- The Counterfeit goods, in some cases, feature copies of artwork from genuine "Life is good" shirts and designs but are colored in a manner that would never be found in an authentic item;






- The dye work on the Counterfeit goods contains imperfections and is otherwise distinguishable from the quality of the dye work of a genuine "Life is good" shirt;

- Other samples of the Counterfeit goods feature other imperfections that are not found in genuine products.

(True copies of photos depicting genuine "Life is good" shirts in comparison to the corresponding Counterfeit goods are attached to the complaint as "Exhibit E.") Compl., ¶30.

On March 2, 2007, DiNatale received an e-mail from BS Co. substantially identical to its mass e-mail of October 2006 offering to sell 1774 counterfeit "Life is good" shirts. Compl., ¶31. Upon information and belief the Defendants continue to sell and distribute goods in interstate commerce bearing a counterfeit "Life is good" designation. Compl., ¶32. The Defendants' sale of the counterfeit "Life is good" shirts is likely to injure Plaintiff's business reputation, diminish Plaintiff's sales revenue and diminish Plaintiff's market share. Compl., ¶33. Additionally, such use by the Defendants is likely to cause confusion with Plaintiff's registered trademarks. Compl., ¶34. Further, the Defendants have caused and are likely to cause mistake, confusion, or deception among the consuming public as to the source or origin of the parties' respective goods and services, and to introduce a false belief that Plaintiff and the Defendants are affiliated. Compl., ¶35.

If the Defendants are not enjoined from further sales of counterfeit "Life is good" products or otherwise using the "Life is good" and "Do What You Like, Like What you Do" marks and the "Jake symbol," Plaintiff will suffer immediate and irreparable harm. Compl., ¶36.

## ARGUMENT

### POINT I

### PLAINTIFF IS ENTITLED
### TO A TEMPORARY RESTRAINING ORDER

Pursuant to Fed.R.Civ.P. Rule 65, this court is empowered to issue a temporary restraining order ("TRO") when the facts justify such relief. It is well-settled that "the purpose of a temporary restraining order is to preserve an existing situation in the status quo until the Court has an opportunity to pass upon the merits of the demand for a preliminary injunction." *Warner Bros., Inc. v. Dae Rim Trading, Inc.*, 877 F.2d 1120, 1125 (2d Cir. 1989), *quoting*,

*PanAmerican World Airways, Inc. v. Flight Engineers' Int'l Ass'n,* 306 F.2d 840, 842-43 (2d Cir 1962); *see also*, 3 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 30.19 at 30-76 (3d Ed. 1994).

Here, the evidence is undisputed that Defendants are selling Life is good counterfeit goods bearing Plaintiff's distinctive, valuable and federally registered Marks, without Plaintiff's consent or approval. For each day that Defendants are permitted to continue selling the products at issue, Plaintiff's business and hard-earned reputation will suffer irreparable harm. These circumstances warrant the issuance of a TRO pursuant to F.R.C.P. 65(b) by this Court to prevent further irreparable harm and to ensure that the imitation Life is good products do not disappear once Defendants are notified of this action. *See Matter of Vuitton et Fils S.A.*, 606 F.2d 1, 4 (2d Cir. 1979)(*ex parte* TRO to prevent further sale of infringing goods).

> … If notice is required, that notice all too often appears to serve only to render fruitless further prosecution of the action. This is precisely contrary to the normal and intended role of "notice," and it is surely not what the authors of the rule [Rule 65 of the Federal Rules of Civil Procedure] either anticipated or intended.

*Matter of Vuitton et Fils S.A.*, 606 F.2d at 5.

In light of the illicit activity in which Defendants have already engaged, they will, in all likelihood, take steps to thwart the relief sought if it is provided notice of Plaintiff's application for a TRO. There is no question that such notice would provide Defendants with the opportunity to transfer or sell the infringing goods, or simply remove and destroy the labels bearing the counterfeit Life is good trademark and documents related thereto. Thus, Plaintiff seeks a TRO to maintain the status quo until this Court can fully resolve this matter and conduct a hearing on Plaintiff's application for a preliminary injunction.

**POINT II**

**PLAINTIFF IS ENTITLED TO
A PRELIMINARY INJUNCTION**

Plaintiff has clearly met its burden of proving it is entitled to a preliminary injunction enjoining Defendants' aforementioned illegal conduct. In this Circuit, to obtain a preliminary injunction, a party must demonstrate (a) irreparable harm, and either (b) a likelihood of success on the merits, or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor. *American Cyanamid Co. v. Compagan per la Farmacie in Italia, S.p.A.*, 847 F.2d 53, 55 (2d Cir. 1988)(*per curiam*); *Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.*, 832 F.2d 1311, 1324 (2d Cir. 1985); *Matter of Vuitton et Fils S.A.*, 606 F.2d at 4.

In cases alleging trademark infringement in violation of the Lanham Act, a showing of likelihood of confusion as to source or sponsorship of the alleged infringing goods establishes the requisite likelihood of success on the merits as well as the requisite irreparable harm. *Id.*

Plaintiff has clearly met this burden. The evidence shows that Defendants are representing that the T-shirts they sell are a genuine Life is good product, using the Life is good trademark and other Marks, which Defendants are not licensed or otherwise authorized to exploit.

In light of Defendants' blatant intentional scheme to "palm off" its products as genuine Life is good products, Plaintiff has demonstrated likelihood of confusion as to source of origin of Defendants' Life is good products, as a matter of law. As the Second Circuit held in *Matter of Vuitton et Fils S.A.*, 606 F.2d at 4:

> Here, we believe that such a likelihood of product confusion exists. The allegedly counterfeit Vuitton merchandise is virtually identical to the genuine items. Indeed the very purpose of the individuals

>marketing the cheaper items is to confuse the buying Public into
>believing it is bovine the true article.

Thus, Plaintiff has met its burden of demonstrating likelihood of success on the merits and irreparable harm. *American Cyanamid Co.*, 847 F.2d at 55; *Home Box Office, Inc.*, 832 F.2d at 1314. Consequently, Defendants should be preliminarily enjoined from all of the foregoing acts, including the sale and offer to sell counterfeit Life is good products.

## POINT III

### PLAINTIFF IS ENTITLED TO EXPEDITED DISCOVERY

In this circuit, expedited discovery pursuant to Fed.R.Civ.P. 26(d) and 34(b) is available upon a showing of: (1) irreparable injury; (2) some probability of success on the merits; (3) some connection between expedited discovery and the avoidance of the irreparable injury; and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted.[2] *Twentieth Century Fox Film Corp. v. Mow Trading Corp.*, 749 F. Supp. 473, 475 (S.D.N.Y. 1990).

Plaintiff showed above that Defendants' use of counterfeit Life is good Marks is likely to cause confusion as to source or sponsorship in violation of the Lanham Act, and is causing Plaintiff irreparable harm. Therefore, Plaintiff has shown a likelihood of success on the merits. S*ee* Point II, *infra*.

Plaintiff requires expedited discovery to learn the full nature and extent of Defendants' infringement and misappropriation of the Life is good Marks, as well as the original source of the counterfeit goods. Plaintiff particularizes the requested discovery in the Proposed Order

---

[2] Some courts have held that expedited discovery is available upon a showing of good cause, and that expedited discovery is particularly appropriate on a preliminary injunction motion to permit prompt hearings on the motion. *See, In re First Commodity Corp. Customer Accounts Litigation*, 119 F.R.D. 301, 303 (D. Mass. 1987); *see also*, *Pod-Ners, LLC v. Northern Feed & Bean of Lucerne Ltd.,* 204 F.R.D. 675 (D. Col. 2002).

submitted herewith.  Any harm that Defendants may suffer from prompt discovery of this information is far outweighed by the irreparable harm Plaintiff will suffer if it must await the formal commencement of discovery to learn the full extent and nature of Defendants' infringing activities.  Therefore, Plaintiff request for expedited discovery is reasonable and necessary to prevent continuing undue prejudice to Plaintiff, and should be granted.  *See Twentieth Century Fox Film Corp. v. Mow Trading Corp*., 749 F. Supp. at 475.

## POINT IV

### DEFENDANTS SHOULD BE REQUIRED TO RECALL ALL INFRINGING GOODS

In light of the foregoing, Plaintiffs further requests that an order be entered directing Defendants, their directors and officers, agents, servants, employees, and all other persons in active concert or privity or in participation with them, to recall from all wholesalers, jobbers, dealers, retailers and distributors, and all others known to Defendants, any and all infringing and counterfeit Life is good products.

"The imposition of a recall requirement is well within the district court's broad powers as a court of equity."  *Yuman Design Inc. v. Chaindom Enterprises, Inc.* 53 U.S.P.Q.2d 1590, 1596 (S.D.N.Y. 1999), citing *Perfect Fit Indus., Inc. v. Acme Quilting Co. Inc.,* 646 F.2d 800, 805 (2d Cir. 1981).  "A district court must consider the likely burden and expense of a recall to the defendant, and balance that burden against the benefit that would accrue to the plaintiff."  *Yuman Design,* 53 U.S.P.Q. at 1596 citing *Behnam Jewelry Corp. v. Aron Bastia Corp.*, 45 U.S.P.Q.2d 1078 (S.D.N.Y. 1997).

Here, the burden to Defendants in recalling existing stock would not be unduly burdensome.  Defendants need only write a letter to their wholesale customers and pay the cost of the return for those customers.  Moreover, the recall of wholesale orders would benefit

Plaintiff, that risks losing customers if Defendants' products bearing the infringing and counterfeit Life is good trademark are further disseminated in the general marketplace.

For the foregoing reasons, the Court should grant Plaintiff the requested temporary restraining order, preliminary injunction, expedited discovery and product recall.

                                            Respectfully Submitted,
                                            Life is good, Inc.,
                                            By its attorneys,

                                            */s/ Glenn F. Ostrager*
                                            Glenn F. Ostrager (GFO 2023)
                                            Roberto L. Gomez (RLG 6474)
                                            Andres N. Madrid (ANM 5926)
                                            OSTRAGER CHONG
                                            FLAHERTY & BROITMAN P.C.
                                            570 Lexington Avenue, 17th Floor
                                            New York, NY 10022
                                            Tel. No. (212) 681-0600

Dated: April 4, 2007